**Jason A. CAPPELLI, Plaintiff–Appellant,**

v.

**Honorable James C. DEMLOW, Judge of the Jefferson County Court, Defendant–Appellee.**

**No. 95CA0341.**

Colorado Court of Appeals, Div. V.

June 27, 1996.

Rehearing Denied July 25, 1996.

Certiorari Denied April 7, 1997.

Vincent C. Todd, Lakewood, for Plaintiff–Appellant.

David J. Thomas, District Attorney, Donna S. Reed, Chief Appellate Deputy D.A., Golden, for Defendant–Appellee.

Opinion by Judge CASEBOLT.

Plaintiff, Jason A. Cappelli, appeals the trial court's dismissal of his civil action brought pursuant to 42 U.S.C. § 1983 (1988) and C.R.C.P. 106 against defendant, James C. Demlow, a judge of the Jefferson County court. We affirm.

On January 13, 1994, Cappelli was arrested and charged in Jefferson County court with two counts of fourth degree arson and one count of obstructing a fireman. The criminal case was assigned to Judge Demlow.

Six months later, after Cappelli had been admitted to bail, the People filed a motion seeking to obtain a mental competency evaluation pursuant to §§ 16–8–110 and 16–8–111, C.R.S. (1986 Repl.Vol. 8A). As grounds, the motion stated that, soon after being contacted concerning the incident, defendant had spoken to an investigating officer, and it set forth a summary of those conversations.

The officer stated that defendant had expressed a strong desire to watch fires and gained pleasure from them; that he had lighted many fires in the fireplace but then needed to see bigger fires; and that he had been hearing voices and had admitted that he could not control his actions, sometimes feel-

ing that his head would explode if he did not act. Further, the officer reported defendant's statements that "he could enjoy seeing people get hurt," but that he had no intent to inflict injury; that he often watched a television crime show and wanted to reenact the crimes depicted; and that he had been in several mental institutions, but none of them had helped him. Finally, the officer reported that defendant had admitted that he had a severe problem and needed help.

On August 5, 1994, after Cappelli responded to the motion by averring his competency, and after a hearing in which no additional evidence was presented orally, Judge Demlow granted the motion. However, the order stated that, because the court had found the information regarding Cappelli's competency insufficient to make a preliminary or final competency finding, Cappelli was to be held by the sheriff in the county jail for a competency evaluation. It further ordered the Jefferson County Mental Health Department to examine Cappelli and file a report on the examination by August 15, 1994. Accordingly, Cappelli was taken into custody.

Cappelli then filed a civil complaint with a motion for a temporary restraining order in the trial court seeking to restrain Judge Demlow from ordering or pursuing his commitment and the evaluation and further seeking costs and attorney fees. The motion claimed that Judge Demlow's actions were in violation of various provisions of the federal constitution, including the Fourth and Fourteenth Amendments, and in violation of 42 U.S.C. § 1983 (1988). In support of the motion, Cappelli cited *Pulliam v. Allen*, 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) for the proposition that the doctrine of judicial immunity is not a bar to prospective injunctive relief or a claim for attorney fees against a judicial officer.

The trial court granted, in part, the motion for the temporary restraining order by releasing Cappelli from custody on August 6, 1994, but it denied the request to prohibit a competency examination. The record does not reflect, however, that Cappelli ever underwent any competency examination. A preliminary injunction hearing was continued upon motion of Judge Demlow and the temporary restraining order remained in effect.

Cappelli then moved for summary judgment and counsel for Judge Demlow filed a response. Judge Demlow's counsel also moved to vacate the temporary restraining order because Cappelli had not appeared, as promised, for the competency examination. After responses were filed and a hearing held, the trial court vacated the temporary restraining order and denied Cappelli's summary judgment motion.

Counsel for Judge Demlow thereafter filed a motion for summary judgment and the trial court later dismissed the case on the date set for trial because Cappelli's counsel acknowledged that, given the trial court's ruling on the applicable law, he could not prevail. This appeal followed.

I.

■ As best we can discern Cappelli's argument, he appears first to contend that his right both to procedural and substantive due process under the Fourteenth Amendment was violated because the statutory standard under §§ 16–8–110 and 16–8–111, C.R.S. (1986 Repl.Vol. 8A) only requires a court to find "reason to believe" mental incompetency to stand trial before ordering a commitment and evaluation, rather than requiring probable cause. In essence, we understand Cappelli to contend that the "reason to believe" standard is arbitrary and capricious and lacks a rational basis because it allows a court to order evaluation using an improper standard, and that, in addition to the defective nature of the standard, the procedure for its application is likewise flawed. We disagree with these contentions.

First, we note that Cappelli's argument combines procedural and substantive due process contentions. Given the nature of his argument and the interconnection between procedural and substantive due process in this context, we treat his contentions together.

■ Involuntary commitment of an accused person in a criminal case for the purposes of mental evaluation constitutes an infringement upon an individual's liberty. *See*

*People v. Chavez,* 629 P.2d 1040 (Colo.1981); *People v. Scherrer,* 670 P.2d 18 (Colo.App. 1983). Consequently, an accused person in a criminal case is entitled to some sort of process before being committed and evaluated. The appropriate query is the amount of process due. *People v. Chavez, supra.*

In the context of a commitment to a mental institution, three factors must be addressed in determining whether a person has received the process constitutionally due: (1) the weight of the governmental interest in the commitment process; (2) the severity of the deprivation suffered by the individual as a result of the government action; and (3) the functional appropriateness of the disputed procedures for minimizing the risk of an erroneous decision in resolving the competing claims of the parties. *See People v. Chavez, supra.*

Section 16–8–110, C.R.S. (1986 Repl.Vol. 8A) states, in pertinent part:

(1) ... [N]o person shall be tried, sentenced, or executed if he is incompetent to proceed at that stage of the proceedings against him.

(2) The question of the defendant's competency to proceed shall be raised in the following manner:

(a) If the judge has reason to believe that the defendant is incompetent to proceed, it is his duty to suspend the proceeding and determine the competency or incompetency of the defendant as provided in § 16–8–111.

(b) By motion of either the prosecution or defense made in advance of the commencement of the particular proceeding.

Further, the relevant portion of § 16–8–111, C.R.S. (1986 Repl.Vol. 8A) provides that:

(1) Whenever the question of a defendant's incompetency to proceed is raised, the court shall make a preliminary finding either that the defendant is competent to proceed or that he is not. If the court feels that the information available to it is inadequate for making such finding, it may order a competency examination or such other investigation as it deems advisable.

Thus, §§ 16–8–110 and 16–8–111 permit a court, on its own motion or the motion of the prosecution or defense counsel, to order a mental evaluation of an accused person to determine whether that person is competent to engage in the critical stages of a criminal proceeding.

To accomplish such an evaluation, the court may order the defendant to be committed to the Colorado psychiatric hospital in Denver, the Colorado mental health institute at Pueblo, the place where he is in custody, or such other public institution designated by the court. Section 16–8–106, C.R.S. (1986 Repl.Vol. 8A). *See also* § 16–8–111(2), C.R.S. (1986 Repl.Vol. 8A).

■ The purpose of §§ 16–8–110 and 16–8–111 is to ensure against a violation of due process that would arise if a defendant who is not mentally competent were required to stand trial or participate in other critical criminal procedures. *Schwader v. District Court,* 172 Colo. 474, 474 P.2d 607 (1970). *See Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975) (putting an accused on trial while he or she is incompetent violates due process of law); *People v. Zapotocky,* 869 P.2d 1234 (Colo.1994). Therefore, a court has a duty to suspend criminal proceedings if a doubt is raised as to the defendant's competency to join meaningfully in the proceedings. *People v. Scherrer, supra.*

■ Similarly, due process is violated when a trial court refuses to accord an accused an adequate hearing upon a claimed incompetency to stand trial. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966). Indeed, a claim of incompetence to stand trial on the issue of guilt is so basic to the concept of fundamental fairness that it cannot be waived. *Drope v. Missouri, supra* (incompetent person cannot waive constitutional rights and a trial court must carefully safeguard such rights should the court have a reasonable doubt as to competency); *Jones v. District Court,* 617 P.2d 803 (Colo.1980); *People v. Lopez,* 640 P.2d 275 (Colo.App. 1982). In sum, an incompetent person cannot be tried until that condition has abated. *Parks v. Denver District Court,* 180 Colo. 202, 503 P.2d 1029 (1972).

■ If an accused person is allowed to participate in criminal proceedings while mentally incompetent, the constitutional via-

bility of those proceedings is seriously compromised. *See Coolbroth v. District Court,* 766 P.2d 670 (Colo.1988) (placing incompetent defendant on trial would vitiate adjudicatory process and validity of any final judgment); *People v. Arkadie,* 692 P.2d 1145 (Colo.App.1984) (once issue of competency properly raised, failure to follow competency statute requires reversal of conviction).

Thus, here, several governmental interests are advanced by §§ 16–8–110 and 16–8–111. First, the government's interest in preventing a violation of a defendant's constitutional due process rights is involved. This interest is at least co-extensive with the defendant's interest in safeguarding his or her own due process rights, and thus, it is indisputable that this is a weighty consideration.

Second, the state's interest in an efficient and reliable criminal justice system is also involved, as is the corollary interest in assuring the constitutionality of final criminal convictions. We find these to also be weighty governmental interests.

Further, no penal or punitive considerations underlie the state's interest in determining competency. Rather, the purpose of commitment for a competency evaluation is to furnish both the state and the defendant with an opportunity to assess the defendant's mental status, to determine if treatment is appropriate, and to ensure the protection of members of society. *See People v. Chavez, supra; Jones v. District Court, supra.*

Cappelli's liberty interest in remaining out of confinement is also of moment, as is his interest in avoiding a mental competency evaluation. *See People v. Chavez, supra.* We note, however, that § 16–8–112, C.R.S. (1986 Repl.Vol. 8A) provides for release of the defendant on bail, provided certain requirements are met. *See People v. White,* 819 P.2d 1096 (Colo.App.1991) (release on bail in competency proceeding authorized even if defendant accused of violent crime). We further note that the record does not reflect that Cappelli sought a renewal of bail here.

In our view, the severity of the impingement upon Cappelli's liberty interest is less when compared to the weight of the other interests involved and leads us to conclude that the governmental interests outweigh the liberty interests asserted.

As to the procedure followed to minimize the risk of an erroneous decision, § 16–8–110 allows the issue of the defendant's competence to be raised by defense counsel, the prosecution, or the court.

█ The party that presents the issue must merely raise a doubt in the mind of the judge that the defendant is competent to stand trial. *See Parks v. Denver District Court, supra.* However, because attorneys are officers of the court, when they address the court upon the mental competency issue, their declarations are virtually made under oath. *See Jones v. District Court, supra.*

█ A defendant's irrational behavior or his or her demeanor at a hearing or trial may be sufficient, of themselves, to require an evaluation. There are no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. *Drope v. Missouri, supra.*

In view of the weighty interests of the state involved here as well as those of defendants generally, together with the subtleties in determining competency, the procedure and substantive standard for minimizing the risk of an erroneous decision by creating a relatively lower threshold of "reason to believe" in resolving the competing claims of the parties is functionally appropriate. This is so even though, as Cappelli contends, probable cause represents a higher and more stringent standard than "reason to believe."

The use of the lesser standard here is appropriate because, if a court errs in applying it, nevertheless, it will most likely err by providing more protection of due process rights, rather than less. Furthermore, there is no definitive constitutional standard with respect to the nature and quantum of evidence necessary to require resort to an adequate procedure for determining competency. Nonetheless, it is clear that constitutionally adequate standards are provided by statutes that require a competency hearing

whenever evidence is presented which raises a bona fide doubt respecting the accused's competency. *People v. Morino*, 743 P.2d 49 (Colo.App.1987). *See also* ABA, Standards for Criminal Justice, Standard 7–4.2 (1982).

Therefore, because a "reason to believe" standard satisfies due process requirements, we see no constitutional basis to require a higher standard.

Given this threshold, then, we find it very unlikely that a court would erroneously find there was "reason to believe" that a criminal defendant was mentally incompetent to stand trial. Nevertheless, Cappelli argues that, because Judge Demlow based his ruling concerning Cappelli's questionable competency solely upon a report by an investigator concerning statements he allegedly made six months previously, the judge's ruling, especially in the face of defense counsel's insistence that Cappelli was mentally competent, was in error. However, Cappelli argues that these circumstances indicative of competency precluded Judge Demlow from having probable cause to believe that Cappelli was mentally incompetent. But, Cappelli does not maintain that the relevant circumstances would bar Judge Demlow, as a matter of law, from having *reason to believe* that Cappelli was mentally incompetent.

In sum, inasmuch as the statutes governing involuntary commitment and mental evaluation of a defendant involve *weighty* governmental interests, and because of the significant consequences to due process that an error in making the determination of mental competency would have, the lower "reason to believe" standard that an accused is mentally incompetent to stand trial is an appropriate threshold for commencing the determination of mental competency. Thus, we conclude that the procedure for commitment and evaluation under §§ 16–8–110 and 16–8–111 meets the due process requirements of the Fourteenth Amendment.

 Nor does the fact that Cappelli was committed for a period of time violate his due process rights. Section 16–8–111(2), C.R.S. (1986 Repl.Vol. 8A) permits commitment for a competency examination prior to the hearing to determine competency. Section 16–8–

106, C.R.S. (1986 Repl.Vol. 8A) also permits commitment to specified facilities.

While Cappelli's liberty interest in avoiding confinement demands that he be given an opportunity to controvert any presumed need for his commitment, that is not to say that the hearing must precede the commitment to determine competency. *See People v. Chavez, supra.*

Indeed, any hearing on the issue broader than the hearing in which the court here concluded that there was reason to believe Cappelli was incompetent would be meaningless until trained medical experts were afforded a reasonable opportunity to observe and examine Cappelli and report their finding. Thus, some time gap between the determination that there is reason to believe incompetence and the actual determination of competency is unavoidable. *See Ragsdale v. Overholser*, 281 F.2d 943 (D.C.Cir.1960).

Furthermore, Cappelli did, in fact, receive a hearing on the motion requesting a competency determination filed by the People before he was committed. Hence, in any event, he was accorded due process as to this aspect of the matter.

Here, Judge Demlow ordered that Cappelli be taken into custody to the county jail and held until the mental evaluation could be completed. Judge Demlow also ordered the mental health evaluators to perform the evaluation, and prepare and submit a report within ten days, at which time Judge Demlow would hear the results of the evaluation and make further determinations concerning Cappelli.

 Cappelli argues quite fervently that, in essence, the order allowed Judge Demlow to lock him up for an indefinite amount of time. It is correct that neither the order nor §§ 16–8–110 and 16–8–111 imposed a specific time limit on how long Cappelli could be held in custody when placed there for an evaluation. However, the record reflects this indeterminacy was never a concern. Cappelli was released the day after his commitment.

Further, Judge Demlow had scheduled a hearing ten days after he ordered the commitment and evaluation and had required a report to be complete by that date. Once the

report was complete, numerous other procedural safeguards could be triggered, including a requirement for a hearing upon Judge Demlow's findings concerning defendant's competency. Section 16–8–111(2), C.R.S. (1986 Repl.Vol. 8A). Thus the inadequacy of the statute in this regard, if any, had no effect upon Cappelli. *See People v. Mack,* 638 P.2d 257 (Colo.1981) (court declined to address claim that statute was unconstitutional because statute never applied against defendant).

We further note that Cappelli does not specifically challenge the place of his confinement, here, the county jail, as violating his due process rights. *See* § 16–8–106, C.R.S. (1986 Repl.Vol. 8A). Hence, we need not address any concerns about the situs of that overnight confinement.

Accordingly, we conclude that there was no procedural or substantive due process violation. *See Ferguson v. People,* 824 P.2d 803 (Colo.1992) (no substantive due process violation when statute has a rational relationship to a legitimate government interest).

## II.

■ Cappelli's next argument is premised on the fact that a commitment and mental evaluation may be ordered under the civil mental health commitment statute, § 27–10–106, C.R.S. (1989 Repl.Vol. 11B), only if a court finds probable cause to believe that a person is a danger to himself or others or is gravely disabled, but that, under §§ 16–8–110 and 16–8–111, such commitment requires only a "reason to believe" that a criminal defendant is mentally incompetent to stand trial. Cappelli argues that, because of this different standard, §§ 16–8–110 and 16–8–111 violate the Fourteenth Amendment's equal protection clause. We are not persuaded.

■ The Fourteenth Amendment requirement of equal protection does not require that all persons be dealt with identically, but it does require that any distinction made have some relevance to the purpose for which the classification is made. *People v. Chavez, supra.* However, in circumstances such as here in which no fundamental right or suspect classification is at issue, the state need only show a rational relationship to a legitimate public interest in order to satisfy the equal protection clause. *People v. Chavez, supra.*

Section 27–10–106, C.R.S. (1989 Repl.Vol. 11B) provides the standards that must be met in order for a court to order involuntary commitment and mental evaluations in the civil context. That statute provides, in pertinent part, that:

(1) Any person alleged to be mentally ill and, as a result of mental illness, to be a danger to others or to himself or to be gravely disabled may be given an evaluation of his condition under a court order....

. . . .

(3) The petition for a court-ordered evaluation shall contain the following:

. . .

(c) Allegations of fact indicating that the respondent may be mentally ill ... and showing reasonable grounds to warrant an evaluation.

. . .

(4) Upon receipt of a petition satisfying the requirements of subsection (3) of this section, the court shall designate a facility, approved by the executive director, or a professional person to provide screening of the respondent to determine whether there is probable cause to believe the allegations.

(5) Following the screening, the facility or professional person designated by the court shall file his report with the court. The report shall include a recommendation as to whether there is probable cause to believe that the respondent is mentally ill, and as a result of mental illness, is a danger to others or to himself or gravely disabled and whether the responded will voluntarily receive evaluation or treatment....

(6) Whenever it appears ... to the satisfaction of the court that probable cause exists to believe that the respondent is

mentally ill and, as a result of such mental illness, is a danger to others or to himself or is gravely disabled ... the court shall issue an order for evaluation and authorizing a peace officer to take the respondent into custody ... for seventy-two hour treatment and evaluation....

As an initial matter, it is useful to point out that even though a civil commitment and evaluation requires a finding by the court that there is probable cause to believe that the respondent is a danger to himself or others or is gravely disabled, there is a prior order that the court may enter in the civil context that is similar to that available under the criminal statutes; namely, a court may order that the respondent be screened, at a designated facility, without any prior showing of probable cause, but only upon "reasonable grounds." Thus, the probable cause requirement comes into play only *after* the initial screening is completed.

However, even assuming that there are differences between the statutes providing for commitment and evaluation for the criminally accused and the allegedly mentally ill person in the civil context, we conclude that those differences are rationally related to a legitimate public interest.

Cappelli relies upon the Supreme Court's holding in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) to argue that the statutory differences between the civil and criminal commitment statutes create a violation of the equal protection clause.

*Jackson* involved the statutory procedure for the pretrial commitment of incompetent criminal defendants. Under the state statute there at issue, if, after a competency hearing, a criminal defendant was found by a court to be incompetent to stand trial, he could be simply ordered committed to a mental institution until found to be "sane." No statutory procedure for periodic review of the criminal defendant's condition existed.

The criminal defendant (petitioner) in that case was a deaf-mute with a very low intelligence and virtually no ability to communicate. Physicians examining him had determined that there was little prospect that he would ever become technically "competent" to stand trial because of his disabilities. However, it was not shown that he was a danger to himself or others, nor that he would be unable to care for himself if released.

The petitioner's argument was that, because there was little evidence that he would ever become "sane," the commitment was essentially an indefinite one. As such, the court should have been required to invoke the standards and procedures found in the state's statute governing the commitment of non-criminally accused mentally ill people, but not found in the criminal statute. Most importantly, petitioner argued, the civil statute contained more lenient standards of release than the criminal statute.

In addressing the issue raised, the *Jackson* court reasoned that, because there was no justification for fewer procedural and substantive protections after a finding of mental illness involving the criminally accused than those available to the non-criminally accused, the statute violated the equal protection clause of the Fourteenth Amendment. *See also Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966) (state prisoner civilly committed at the end of his prison sentence denied equal protection when he was deprived of a jury trial on the sanity issue that was statutorily available to all persons civilly committed).

The case at bar is distinguishable quite simply because, here, there are differences between a criminal defendant who is potentially mentally incompetent and a non-criminal who is potentially mentally ill. The difference lies in the incongruent purposes for which a criminal defendant is committed and evaluated and for which a potentially mentally ill non-criminal is committed and evaluated.

An order for commitment and evaluation of a potentially mentally ill person is executed in order to determine whether the person may be involuntarily committed to a mental institution for short-term treatment because of danger to others or to himself or herself or because the person is gravely disabled. Sections 27–10–106, 27–10–107, C.R.S. (1989 Repl.Vol. 11B). A probable cause finding is

required, in part, because a petition for a commitment and evaluation is generally submitted to the court by members of the public at large. Section 27–10–106, C.R.S. (1989 Repl.Vol. 11B). Thus, those protections function to ensure that members of the public seek commitment and evaluation of other members of the public for legitimate, important, and benign reasons. *See People v. Chavez, supra.*

On the other hand, an order for commitment and evaluation of a criminal defendant who is potentially incompetent to stand trial is executed to determine whether due process considerations dictate that the defendant should not participate in critical criminal procedures. *See Hampton v. Tinsley,* 240 F.Supp. 213 (D.Colo.1965), *rev'd on other grounds sub. nom. Patterson v. Hampton,* 355 F.2d 470 (10th Cir.1966). And, as noted above, the use of a lower threshold "reason to believe" standard furthers that interest. These differences have a rational relationship to legitimate state interests.

In addition, unlike the situation in *Jackson,* there is no real concern here that Cappelli would have been committed for an indeterminate amount of time. The statute allows only a commitment period running concurrently with the evaluation. Section 16–8–106, C.R.S. (1986 Repl,. Vol. 8A). Moreover, here, Cappelli was not found incompetent, and thus, the stage of the proceedings at which Cappelli was committed is significantly different than in *Jackson.*

Moreover, § 16–8–111(2) provides that, after the court has made a preliminary finding of incompetency or competency, which may be based upon the evaluation, the court *shall immediately* notify counsel of the determination. Counsel may then request a hearing on the competency issue, after which the court must make a final determination.

Next, § 16–8–112 requires that the court directly thereafter make a determination on the subsequent custodial arrangements for the defendant. Those arrangements, in turn, require periodic review. Sections 16–8–105 and 16–8–114, C.R.S. (1986 Repl.Vol. 8A). *See Parks v. Denver District Court, supra; Jones v. District Court, supra.*

We thus conclude that *Jackson v. Indiana, supra,* does not compel a finding that the statutes involved here violate Cappelli's right to equal protection.

Furthermore, because Cappelli's remaining contentions concern asserted differences between the statutes that would arise only *after* the initial evaluation stage, a stage never reached here, we need not address them. *See People v. Mack, supra; People v. Fuller,* 791 P.2d 702 (Colo.1990) (a person challenging constitutionality of statute must show actual injury to a legally protected interest). Rather, all that is at issue here is the authority initially to order an evaluation, not the procedural or substantive process for determining competency itself.

Hence, we conclude that the state has a legitimate interest in ensuring that criminal defendants are mentally competent to stand trial and that any difference between the civil and criminal commitment statutes is rationally related to legitimate state interests.

The procedure under which Cappelli was committed was not, then, in violation of the equal protection clause of the Fourteenth Amendment. *See People v. Chavez, supra* (pertinent statutes do not violate equal protection or due process); *Parks v. Denver District Court, supra* (pertinent statutes did not suffer from equal protection constitutional infirmity found in *Jackson v. Indiana, supra* ).

### III.

Cappelli finally asserts that the trial court erred in dismissing his complaint, arguing that the order entered under §§ 16–8–110 and 16–8–111 that committed him and required him to undergo a competency evaluation violated his Fourth Amendment rights. Specifically, he contends that Judge Demlow's order to commit him and evaluate his mental competency was a search and seizure carried out without probable cause which therefore violated the Fourth Amendment. However, we conclude that the Fourth Amendment is not applicable to the involuntary commitment and mental evaluation of a criminal defendant by an order of the court; thus, we disagree.

First, we are not aware of any authority which has determined that a court order committing a defendant for evaluation of mental competency to stand trial constitutes a search or seizure within the meaning of the Fourth Amendment.

Second, in view of the due process concerns identified in section I above, we are loath to consider engrafting Fourth Amendment constitutional requirements upon the legislative standard promulgated to govern the judicial adjudication of mental competency. *See People v. Zapotocky, supra* (dismissal of charges is legislative choice and not constitutionally compelled even when incompetent criminal defendant cannot be restored to competency). *See also People v. Chavez, supra* (inconsistent to hold that, for purposes of due process, a defendant adjudicated criminally insane may automatically be committed to a mental facility and also to determine that, for purposes of equal protection, such a defendant enjoys a "fundamental right" to be free from commitment to a mental institution).

Nor does the fact that the General Assembly has chosen to require probable cause in certain circumstances before allowing civil commitment of an incompetent person automatically interpose the Fourth Amendment probable cause standard in a criminal commitment proceeding.

Third, even though we recognize that Cappelli was confined overnight, the purpose of the confinement was not punishment, criminal investigation, or to impose a criminal sanction. Rather, it was to secure his presence for a mental competency evaluation. Under these circumstances, therefore, a significant restraint upon his liberty was not involved; thus, criminal procedural safeguards did not attach. *See People v. Scherrer, supra.*

■ Finally, even if the Fourth Amendment might be applicable in these circumstances, the preference for the oversight of a neutral arbiter exemplified in Fourth Amendment cases is implemented here. *See United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405 82 L.Ed.2d 677 (1984) (detached scrutiny of a neutral magistrate is a more reliable safeguard against improper searches than the hurried judgment of law enforcement officer; judges excluded from the Fourth Amendment's ambit because there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment).

Indeed, the remedy designed to effectuate the Fourth Amendment is the exclusionary rule, which mandates exclusion from evidence in a criminal trial that which was obtained in violation of the Fourth Amendment. The exclusionary rule was historically designed to deter police misconduct rather than to punish the errors of judges and magistrates. *Illinois v. Krull,* 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). *See also Arizona v. Evans,* 514 U.S. ——, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995); *People v. Saint–Veltri,* 935 P.2d 34 (Colo.App.1996) (suppression of statements made by accused after arrest under vacated arrest warrant not required; deterrent purpose of exclusionary rule would not be furthered by applying rule to court employees).

Because we conclude that §§ 16–8–110 and 16–8–111 do not implicate the Fourth Amendment, we need not reach Cappelli's contention that there was no probable cause that he was incompetent to stand trial. And, because we have determined that Judge Demlow's actions in ordering Cappelli involuntarily committed and evaluated were not in violation of the provisions of the federal constitution, we need not address Cappelli's remaining contentions.

The trial court's judgment of dismissal is affirmed.

RULAND and ROY, JJ., concur